**BANKERS GUARANTEE TITLE & TRUST COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. C 66-376.**

United States District Court
N. D. Ohio, E. D.

July 29, 1968.

David H. Wilson and Norman S. Carr, of Brouse, McDowell, May, Bierce & Wortman, Akron, Ohio, for plaintiff.

Donald E. Anderson, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

KALBFLEISCH, Chief Judge.

FINDINGS OF FACT

1. Plaintiff, Bankers Guarantee Title & Trust Company (hereinafter called Bankers), is an Ohio corporation having its principal place of business in Akron, Ohio. The defendant is the United States of America.

2. Bankers is engaged in the mortgage banking business in the Akron area, serving as a mortgage outlet for

various lenders or investors having large sums of money to invest in fixed-income securities such as mortgages. Bankers, as is common to a mortgage banker, receives annual commitments from an investor as to the type and amount of mortgages the investor may desire to purchase. After Bankers has obtained a number of the desired mortgages—usually from commercial builders or individual homeowners—it then sells them as a package to the investor. For its services Bankers may receive a discount fee from an investor and an origination fee from a borrower for the generation of the mortgage loan. In addition, since most institutional investors do not maintain facilities for servicing mortgages in the local areas in which they invest, Bankers receives a fee for servicing the mortgages. The fee usually ranges from $3/8$ to $1/2$ of 1% annually of the outstanding unpaid principal balance of the mortgage portfolio. Servicing of the mortgages involves collection of payments made by the borrower, inspection, and payment of insurance and taxes.

3. In the course of servicing mortgage loans, Bankers often receives prepayments of taxes and insurance from a borrower, which prepayments are placed in escrow accounts in a local bank. Bankers endeavors to maintain a sizeable escrow account, since a large escrow account balance enhances its credit allowance.

4. Herberich - Hall - Harter Company (hereinafter called Herberich) is the parent corporation of Bankers. In 1911 Herberich owned 25% of Bankers' stock and by 1948 had increased its holdings to 80%. Herberich operates title guarantee insurance, real estate brokerage, and casualty insurance businesses which function in an interrelated manner with the operations of Bankers.

5. Since 1911, Bankers had represented the Metropolitan Life Insurance Company (hereinafter called Metropolitan) for the placement of mortgage investments in the Akron area. Bankers and Metropolitan entered into a written agreement in 1945 authorizing Bankers to originate mortgage loans in the Akron area for Metropolitan (Joint Exhibit 1). The 1945 agreement authorized Bankers to service loans for Metropolitan, but it did not require Metropolitan to buy any particular loan, nor did it assure Bankers of the right to service any loan it sold to Metropolitan. The agreement expressly stated that it could be cancelled at will by either party. Over the years, most of the loans generated by Bankers were sold to Metropolitan. In 1963 Bankers was dealing with some forty investors; however, more than 50% of the loans serviced by Bankers were loans owned by Metropolitan.

6. The Kissell Company (hereinafter called Kissell) has been in the mortgage banking business since 1937. It currently acts as a mortgage banking representative for Metropolitan in Cincinnati, Cleveland, Lima, Toledo, Indianapolis, Lexington, Louisville, Pittsburgh, and other cities. Although Kissell deals with other investors, since 1962 it has originated and serviced more Metropolitan loans than any other mortgage banker in Ohio.

7. In 1962 Kissell and Bankers commenced negotiations for the sale to Kissell of the Metropolitan mortgage portfolio then being serviced by Bankers. Ultimately, in March of 1963, these negotiations between Kissell and Bankers resulted in the purchase by Kissell of Bankers' Metropolitan mortgage portfolio for a net sale price of $497,000.00. The total sale price was $502,000.00, with $2,000.00 representing certain tangible property (office equipment, etc.) and $3,000.00 representing an expense of sale. For this purchase price, Bankers sold:

"All of Bankers' right, title and interest in its business of servicing mortgages for Metropolitan Life Insurance Company, including (without limitation) its contract of appointment as Metropolitan's mortgage loan correspondent and servicing agent, which is the subject of a separate assignment." (Joint Exhibit 6.)

8. The total face value of 4,952 mortgages contained in Bankers' Metropolitan portfolio at the time of the sale was $48,391,994.31 (Joint Exhibit 19). Metropolitan consented to the sale and, as part of the sale, the contract between Metropolitan and Bankers was assigned to Kissell (Joint Exhibit 14).

9. The contract of sale between Kissell and Bankers for the Metropolitan portfolio (Joint Exhibit 3) provided that "In order to facilitate the transfer of the business being sold" one David Cook, who was then Executive Vice President of Bankers and who was "primarily responsible for the conduct of the business being sold, will enter the employ of Kissell, as of the closing date." The contract also provided that Kissell was to be given the opportunity to contact other Bankers employees concerning "employment with Kissell after closing."

10. Subsequent to its purchase of the Metropolitan portfolio, Kissell opened a branch in Akron wherein it generates and services loans for Metropolitan.

11. Although its volume was substantially reduced by the sale of the Metropolitan portfolio, Bankers continued to originate and service other mortgage loans in the Akron area.

12. Bankers timely filed with the District Director of Internal Revenue its income tax return for the calendar year 1963 and paid the tax. In its return Bankers treated as a capital gain the entire proceeds from the sale of the Metropolitan portfolio. The District Director determined that the entire amount of the sale proceeds should be taxed to Bankers as ordinary income, and on December 23, 1965 assessed additional taxes and interest against Bankers for the year 1963 in the amount of $148,456.42. Bankers paid the assessment on January 3, 1966 and on January 19, 1966 filed a claim for a refund. The District Director disallowed the claim on May 11, 1966 by mailing to Bankers, by certified mail, a notice of disallowance.

## CONCLUSIONS OF LAW

1. This is a suit to recover internal revenue taxes paid by the plaintiff. This Court has jurisdiction over the parties and of the subject matter, pursuant to Title 28 U.S.C., Section 1346(a) (1).

2. The issue as presented is whether the transaction wherein Bankers sold to Kissell "all of Bankers' right, title and interest in its business of servicing mortgages for Metropolitan Life Insurance Company" constitutes the sale of a capital asset subject to a capital gains tax, as contended by Bankers, or whether Bankers was selling to Kissell only the right to receive service fees for the remaining years of the outstanding loans in the Metropolitan portfolio, thereby converting future income into present income and subjecting the sale proceeds to ordinary income tax, as contended by the Government. The Court here observes an alternative issue which is whether or not the Court should reduce the sale proceeds into fragments and allocate part of the proceeds as going to the right to receive service fees taxable as ordinary income and allocate the remainder as a sale of capital assets taxable as capital gain.

3. Neither Bankers nor Kissell, at the time of the sale of the Metropolitan portfolio, discussed or agreed to an allocation of the money paid by Kissell to Bankers, other than the allocation of $2,000.00 of the sale price for Bankers' furniture, fixtures, and equipment located at Bankers' Mansfield, Ohio, office. Present throughout the trial and cooperating actively with counsel for the Government were officers and counsel of Kissell. Kissell has filed an amicus curiae brief in which it argues that the entire sale proceeds constitute ordinary income to Bankers and that Kissell paid nothing for good will but rather paid solely for the right to earn fees for servicing the Metropolitan portfolio. Bankers argues that the entire sale price covered intangibles and good will.

The reason for such a dispute between Kissell and Bankers is purely economic. If this Court were to declare that the sale was of capital assets such as intangibles and good will, Bankers would be permitted to pay a capital gains tax on the proceeds at a considerable saving

over the ordinary income tax rate. With that decision Kissell could not depreciate such a capital asset. If the Court were to decide that the sale proceeds were taxable as ordinary income, Kissell would realize a considerable saving since the mortgage portfolio could be depreciated over its estimated "life" in which it is expected to produce income.

4. The Fifth Circuit, on several occasions, has considered the problem of whether the sale of a mortgage servicing portfolio is the sale of a capital asset or of a right to earn future income. The question was first raised in Nelson Weaver Realty Company v. C.I.R., 307 F.2d 897 (1962) wherein the fact situation and the issue before the court were precisely the same as in the case at bar. Nelson Weaver was an Alabama corporation engaged in the business of procuring, selling, brokering and servicing mortgage loans. Weaver entered into a contract with the New York Life Insurance Company wherein Weaver became mortgage sales and servicing agent for New York Life in several Alabama cities.

After several years of servicing New York Life mortgages, Weaver entered into a purchase agreement with another mortgage servicing company wherein Weaver sold to the company:

"all of the rights, title, obligations, and benefits pertaining to the servicing contract of all of the mortgages now being serviced by * * * Nelson Weaver Mortgage Company, Inc. for the New York Life Insurance Company * * *."

Weaver claimed the transaction of the sale of the mortgage portfolio was the sale of a capital asset. The Tax Court disagreed, holding that what Weaver really received "was consideration for the transfer of the contingent right to earn future compensation."

The Fifth Circuit Court of Appeals reversed the Tax Court and held that the transaction "represents clearly a sale of a capital asset." The Court explained this holding by pointing out that:

"The contracts between Mortgage Company [Weaver] and the mortgagors gave it access to a large field of customers for other dealings, such as writing of hazard insurance, automobile liability insurance, purchase and sale of real estate, renewal of mortgages, and the like. * * * The bundle of rights belonging to Mortgage Company as the result of its long standing relationship with New York Life, constituted property which was undoubtedly the proper subject of sale.

* * * * * *

"The amount paid to the taxpayer here bore no convincing resemblance to the amount the purchaser would actually collect out of the service contract sold since the purchaser had to pay the cost of the collection. Taking the collection costs into account, the purchaser here would receive from the fees arising from servicing of the mortgages only a fraction of the purchase price of the bundle of rights it acquired from Mortgage Company. [Weaver]

* * * * * *

"Here the taxpayer parted absolutely with title to rights it had accumulated over a number of years by contract and by a course of dealing, together with all of the books and records pertaining to those rights and dealings. It kept nothing but transferred to the purchaser all of its rights, title and interest in all of the valuable property rights arising from its relationship and dealings with New York Life." pp. 900–903.

Judge Rives dissented from the majority holding and stated his analysis as follows:

"[A] substantial part of the $121,-841.11 paid to the Mortgage Company was for the right to receive service fees for the remaining years of the outstanding loans. To that extent the Mortgage Company was simply converting future income into present income.

\* \* \* \* \* \*

"The sale of 'all of the rights, title, obligations and benefits pertaining to the servicing contract,' like the sale of any going business, should, I think, be comminuted into its fragments and the 'purchase price' should be allocated among the various assets sold. \* \* \* I would agree that a part of the $121,841.11 represented the purchase price of capital assets.

\* \* \* \* \* \*

"[T]he part allocated to the right to receive service fees should be taxable as ordinary income and the remainder should be taxable as long-term capital gain." p. 905.

About two months after its decision in *Nelson Weaver*, a different panel of judges on the Fifth Circuit Court of Appeals was asked by taxpayers in United States v. Edison, 310 F.2d 111 (1962), to rule that amounts received by them in consideration for the assignment of their rights under a management contract with an insurance company were taxable as capital gains rather than as ordinary income. The taxpayers cited *Nelson Weaver* in support of their position, but the Court said:

"Except to the extent that the Weaver Mortgage Company case can be sustained on the basis that there was there a sale of a property right equivalent to a sale of a business and good will, which really seems to be the ratio decidendi, that case would appear to be in conflict with the earlier Supreme Court decisions defining capital assets. We, therefore, distinguish it on the stated ground that there was a sale of a business including good will, a circumstance not present here." p. 116.

In Bisbee-Baldwin Corporation v. Tomlinson, 320 F.2d 929 (5 Cir. 1963), approximately six months after the decision in *Edison* and within one year of its *Nelson Weaver* decision, the Fifth Circuit reversed its earlier position taken in *Nelson Weaver* and held that part of the fee received by a taxpayer for the termination of mortgage servicing contracts was "a substitute for the income which would have been earned by Bisbee-Baldwin had the contracts not been transferred." The Court further stated:

"Since \* \* \* the primary value of these mortgage correspondent relationships lay in the right to receive annual percentage commissions, there can be little doubt that the bulk of the sum paid to Bisbee-Baldwin was compensation for the loss of such commissions.

\* \* \* \* \* \*

"Still, some parts of the 'bundle' of contractual rights transferred by Bisbee-Baldwin were capital assets. The mortgage correspondent relationships have value in addition to the rights to servicing commissions. It acts as a 'feeder' for related businesses, such as insurance and real estate, frequently engaged in by mortgage bankers. The monthly escrow deposits made by the mortgagors considerably enhance the servicing agent's credit standing. Moreover, as the dissenting opinion in Nelson Weaver recognized, there *is* a sale of 'good will.' The mortgage portfolio of the mortgage banker tends to increase each year as both the mortgagors and the investors look to the mortgaging servicing agent for further funds and further outlets for investment. The taxpayer's extensive files and equipment are in the nature of capital assets. \* \* \* These items are closely related to the everyday business operations of the taxpayer. They are not so integrally related, however, as to be insusceptible of separate valuation." p. 934.

In *Bisbee-Baldwin*, supra, the Court remanded to the district court for the district court to determine:

"(1) what part of Bisbee-Baldwin's compensation was a substitute for future earnings, and therefore taxable as ordinary income and (2) what part or parts, if any, were capital assets, sold or exchanged, entitled to capital gains treatment." p. 936.

Subsequent to *Bisbee-Baldwin*, the Court decided General Guaranty Mortgage Co. v. Tomlinson, 335 F.2d 518 (CA 5, 1964), where once again it was presented with the question of how to treat proceeds resulting from a transfer of mortgage servicing contracts. The Court again remanded to the district court for an allocation between ordinary income and capital assets, stating:

"[W]hether appellant is entitled to any relief by way of capital gains treatment will depend on the evidence. Further evidence * * * may be required. It is enough to say that here the record does not preclude all capital gains treatment in view of the consideration accorded taxpayer in Bisbee-Baldwin Corp. v. Tomlinson." p. 521.

■ 5. The plaintiff has stated in its post-trial brief that "if the Court holds that the entire sale proceeds are capital gain, it need not overrule *Bisbee-Baldwin* or *General Guaranty Mortgage Co.*" because "both of these cases involve the sale, inter alia, of enforceable contracts to service mortgages." The plaintiff, placing great emphasis on the fact that the Metropolitan contract (Joint Exhibit 1) was subject to cancellation at will, argues that the contract "did not purport to give any right to service," and that, accordingly, none of the sale proceeds can be categorized as going to the "right" to earn or receive future income.

6. The Court considers plaintiff's position in this respect to be clearly without merit. In *Nelson Weaver* the same argument was offered not by the taxpayer but by the Commissioner, who argued that the sale proceeds could not be treated as capital gain since Weaver's contract with New York Life was subject to short term cancellation. Rejecting this argument, the Court stated:

"The short answer to these contentions is that they deal only with possibilities and not with actualities. The fact is that New York Life had maintained the relationship with Mortgage Company for eight years, during which time Mortgage Company sold to New York Life about fifty-five percent of its total number of loans running into millions of dollars. * * * Mortgage Company had built up a large organization dependent in great part upon the permanence of the arrangement existing between it and New York Life. Maybe it took a risk, but risk lies at the basis of all dealings in property and business and constitutes one of the realities of business life and of taxation. * * * 'The closer a tax comes to giving effect to the economic realities, the more bearable it is as the price of national security and of civilization.' And the economic reality is that New York Life did give its approval to the sale by Mortgage Company to Cobbs, Allen and Hall and that such transactions are by no means unknown to the business world." 307 F.2d p. 901.

Both Bankers and Kissell have built up large organizations dependent in great part upon the permanence of the arrangements existing between them and Metropolitan. Kissell, in terms of economic realities, paid $500,000.00 for the right to service the Metropolitan mortgage portfolio in the Akron area. It is this Court's conclusion that it can be said with definiteness and certainty that a part of the sale proceeds received by Bankers was for Kissell's right to earn and receive service fees for the remaining years of the outstanding loans in the Metropolitan portfolio.

7. It also is the conclusion of the Court, however, that the entire sale proceeds were not compensation paid to Bankers solely for the loss of the income it would have received for servicing the Metropolitan portfolio. Bankers sold much more than the present right to earn future income which would be earned by servicing the Metropolitan portfolio. Bankers built up considerable good will over the years it serviced the Metropolitan portfolio and the size of the portfolio had increased substantially since the first few years that Bankers had acted as Metropolitan's mortgage

correspondent. When Kissell took over the Metropolitan portfolio it had high hopes of utilizing this good will to increase the size of the portfolio by originating new loans in the Akron area. The fact that Kissell was expressly given the right to hire some of Bankers' employees, and subsequently exercised that right, establishes that Kissell recognized the value of the relationships between Bankers, Metropolitan, and the mortgagors.

Additionally, Bankers gave up in the transaction the right to utilize the Metropolitan mortgagors' monthly escrow deposits to enhance Bankers' credit standing, and the "feeder" activities of insurance and real estate carried on by Bankers' parent corporation also were lost.

9. It is the Court's conclusion that the evidence in this case compels the Court to allocate the sale proceeds between that portion representing the right to receive service fees and that portion representing sale of good will and capital assets.

10. With respect to the Court's conclusion that an allocation is necessary and proper, the Court makes the following supplemental findings related to the question of what portion of the sale proceeds represents the right to earn future income and what portion represents sale of good will:

A. At the time of the sale of the Metropolitan portfolio the principal balance of the loans in the portfolio was $48,391,994.31. (Joint Exhibit 19.)

B. At the time of the sale, there were 4,952 mortgages in the portfolio. (Joint Exhibit 19.) The Court, for allocation purposes only, will round this figure off to 5,000 mortgages.

C. The average original term of the mortgages in the Metropolitan portfolio at the time of sale was 20 years. The average age of the mortgages in the portfolio at the time of sale was 5 years.

D. The life expectancy of the portfolio at the time of sale, assuming no origination of new mortgages, was 10 years.

E. The principal balance of the mortgage portfolio and the number of mortgages in the portfolio, for purposes of allocation only, would depreciate at the rate of 10% per year at a 10-year straight-line rate.

F. The approximate total gross income to be earned by servicing the Metropolitan portfolio for its 10-year life, for purposes of allocation only, would be $1,145,800.00. To obtain this figure, the Court has adopted as correct the calculations of Government Exhibit F.

G. The cost to service the Metropolitan portfolio, for purposes of allocation only, would be approximately $25.00 per year for each mortgage in the portfolio. To obtain this figure, the Court has adopted as correct the calculations of Plaintiff's Exhibit 4, as subsequently corrected by Plaintiff's Exhibit 8.

H. The proper discount factor to be applied in determining the current or present value at April 1, 1963 of the future income to be earned by servicing the Metropolitan account is 7%. The Court has taken its present value factors from Appendix K, page 405 of Neifeld's Guide to Installment Compilations, Mack Publishing Co. (1931). The same factors appear at page 146 of Inwood-Tables of Interest & Mortality for Purchasing of Estates and Valuation of Properties, Crosby-Lockwood (London, 1930).

11. In accord with the above findings, the Court has prepared a table, attached hereto as an appendix, which sets forth the Court's conclusions with respect to allocation of the sale proceeds.

12. The Court points out at this juncture that the aforementioned table resolves three main areas of dispute between plaintiff and the defendant pertinent to the question of allocation. The first area of dispute goes to the estimated gross servicing income which could be expected to be earned from servicing the

Metropolitan porfolio. The Court, by adopting the gross income calculations presented by the Government in its Exhibit F, has resolved this dispute in favor of the Government. The Court recognizes that in actual fact the Metropolitan portfolio depreciated by approximately 25% in the first nine months after the sale of the portfolio (Joint Exhibit 19) and that this rate of depreciation is considerably higher than the 10% per year figure utilized in the Court's calculations. It is the Court's conclusion, however, that the 10% per year straight-line depreciation of the principal balance of the portfolio and of the number of mortgages in the portfolio most fairly reflects the anticipated gross servicing income to be earned over the estimated life of the portfolio.

13. The second area of dispute concerns the estimated servicing expenses which would be incurred as the gross servicing income is earned during the life of the portfolio. The Government in its Exhibit F bases its estimate of servicing expenses on what it cost Kissell to service an average loan. The Court considers Kissell's costs to be totally irrelevant since it is Bankers that is being taxed on the future income stream and the Court must look to Bankers' costs to determine the net income to be earned by servicing the Metropolitan portfolio.

14. The third area of dispute goes to the proper discount factor to be applied in determining the present worth of future income. Bankers has argued that a 15% discount figure should be applied because of the "risk of cancellation inherent in the Metropolitan contract." The Court heretofore has dispensed with this contention and, accordingly, concludes that the 7% discount figure proposed by the Government is a much more reasonable factor to be applied in evaluating the current worth of the future dollars to be earned by servicing the Metropolitan portfolio.

15. The Court, in arriving at its allocation figures, is fully cognizant of the fact that the allocation is lacking in scientific exactness. By necessity the Court was forced to utilize many estimates rather than factual data. But the Court takes comfort from the statement of Judge Friendly in C. I. R. v. Ferrer, 304 F.2d 125, 135 (CA 2, 1962):

"In such instances, where part of a transaction calls for one tax treatment and another for a different kind, allocation is demanded. * * * If it be said that to remand for this purpose is asking the Tax Court to separate the inseparable, we answer that no one expects scientific exactness; that however roughly hewn the decision may be, the result is certain to be fairer than either extreme."

It is the strong feeling of the Court that its order of allocation, even though it may be "roughly hewn," is certainly more just and fair than an order that the sale proceeds be taxed entirely either as ordinary income or capital gain.

16. The Court orders an allocation of the sale proceeds of $497,000.00 as follows: $362,236.00 is to be taxed as ordinary income and $134,764.00 is to be taxed as capital gain. Counsel entered into a stipulation regarding the computation of a refund as shown on page 406 of the trial transcript, as follows:

"MR. ANDERSON: Well, what I had said and I thought we stipulated to was that if the Court determines the Plaintiff is entitled to a refund of taxes, that the Plaintiff and the Government will then attempt to jointly compute the amount of tax and assessed interest which should be refunded in accordance with the Court's findings of fact and of law.

"MR. WILSON: And if it should be necessary at that time to introduce any of the tax returns or other papers which would be necessary to make that computation, those papers can be introduced at that time.

"MR. ANDERSON: Of course."

Counsel shall prepare an entry of judgment accordingly.

The foregoing is adopted by the Court as its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

APPENDIX

TABLE OF EVALUATION OF CURRENT WORTH AS OF APRIL 1963 OF FUTURE DOLLARS TO BE EARNED BY SERVICING THE METROPOLITAN PORTFOLIO

| PERIOD | GROSS SERVICE FEE INCOME | GROSS LATE CHARGE INCOME | NUMBER OF MORTGAGES IN PORTFOLIO | SERVICING EXPENSE AT $25.00 PER MORTGAGE | NET INCOME | 7% FACTOR | CURRENT VALUE |
|---|---|---|---|---|---|---|---|
| 4/1/63-3/31/64 | $203,900.00 | $10,600.00 | 5,000 | $125,000.00 | $89,500.00 x | .9346 = | $ 83,647.00 |
| 4/1/64-3/31/65 | 182,500.00 | 11,300.00 | 4,500 | 112,500.00 | 81,300.00 x | .8734 = | 71,007.00 |
| 4/1/65-3/31/66 | 161,200.00 | 10,500.00 | 4,000 | 100,000.00 | 71,700.00 x | .8163 = | 58,529.00 |
| 4/1/66-3/31/67 | 139,800.00 | 9,500.00 | 3,500 | 87,500.00 | 61,800.00 x | .7629 = | 47,147.00 |
| 4/1/67-3/31/68 | 118,400.00 | 8,100.00 | 3,000 | 75,000.00 | 51,500.00 x | .7130 = | 36,720.00 |
| 4/1/68-3/31/69 | 97,000.00 | 6,600.00 | 2,500 | 62,500.00 | 41,100.00 x | .6663 = | 27,385.00 |
| 4/1/69-3/31/70 | 75,700.00 | 5,200.00 | 2,000 | 50,000.00 | 30,900.00 x | .6227 = | 20,477.00 |
| 4/1/70-3/31/71 | 54,300.00 | 3,700.00 | 1,500 | 37,500.00 | 20,500.00 x | .5820 = | 11,931.00 |
| 4/1/71-3/31/72 | 32,900.00 | 2,200.00 | 1,000 | 25,000.00 | 10,100.00 x | .5439 = | 5,493.00 |
| 4/1/72-3/31/73 | 11,600.00 | 800.00 | 500 | 12,500.00 | (100.00) | = | (100.00) |
| | | | | TOTAL CURRENT NET WORTH | | | $362,236.00 |