Richard M. BOE and Mary Lois Boe, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17562.

United States Court of Appeals
Ninth Circuit.

Aug. 21, 1962.

W. Lee McLane, Jr., Nola McLane, and Thaddeus Rojek, Phoenix, Ariz., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum and Burt J. Abrams, Morton K. Rothschild, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS and DUNIWAY, Circuit Judges, JAMESON, District Judge.

DUNIWAY, Circuit Judge.

Petition to review a decision of the Tax Court. The facts are not in dispute; the argument concerns their legal effect. We conclude that the decision of the Tax Court is correct. For convenience, we refer to petitioners, husband and wife, as "taxpayer".

Deficiencies in personal income tax for the years 1952, 1953 and 1954 are involved. They arise from the purchase of the medical practice of F. W. Callison, M.D., who conducted a group medical practice. Each patient signed a written contract, under which the doctor and his staff undertook to render medical, surgical, hospital and incidental services. In return, the patient paid "dues", in advance, "in accordance with the then current, effective and published dues rate schedule for the attained age of the Member". The agreement was terminable at will by either party.

Dr. Callison desired to withdraw from the practice, and four of his associates decided to buy him out. The parties negotiated a written agreement, effective August 1, 1947. It provided, among other things:

"* * * Whereas, it is agreed * * * that the Goodwill is an important and the principal part of the assets being sold * * *.

"First Party does hereby sell * * * the contract medical practice * * * conducted by First Party, including, * * *.

"(a) The Goodwill * * *.

"(b) All moneys and things of value receivable or received which have accrued or may accrue after the effective date hereof * * *.

"(c) All interest * * * in all contracts * * * with individuals or groups for medical, surgical, and/or hospital services * * *.

"(d) That portion of the furniture, fixtures, fittings, instruments, and equipment, together with the records and all other personal property and chattels, as more specifically set forth in Exhibit 'A' hereto attached * * *.

\*  \*  \*  \*  \*  \*

"(e) The medical and surgical supplies, drugs and accessories used in connection with said practice.

\*  \*  \*  \*  \*  \*

"The purchase price and consideration aforesaid is divided as follows:

"(a) The * * * personal property and chattels as * * * set forth in Exhibit 'A' * * *, at * * * the cost * * * thereof less depreciation * * *.

"(b) The balance thereof to the Goodwill and other properties hereby transferred of said practice."

There was also a covenant not to compete.

The following additional facts are from the Tax Court's findings:

"Of the contract price, $2,346.27 represented the cost of * * * tangible assets purchased * * *. [T]he total purchase price was $272,389.08.

"The total number of medical service contracts outstanding on August 1, 1947, was 8,984, and the purchasers * * * allocated the * * * purchase price * * * namely, $270,042.81, to these con-

tracts. This partnership * * * continued to operate the contract medical practice until September 15, 1950.

"The following table reveals the status of the contracts sold by Callison and the extent of new contracts acquired:

| Date | Original Contracts In Force | Contracts Terminated During Period | New Contracts In Force | Total Contracts In Force |
|---|---|---|---|---|
| 12/31/47 | 8,522 | 462 | 448 | 8,970 |
| 12/31/48 | 7,792 | 730 | 857 | 8,649 |
| 12/31/49 | 7,152 | 640 | 1,283 | 8,435 |
| 9/15/50 | 6,691 | 461 | 1,523 | 8,214 |
| 8/31/51 | 6,049 | 642 | 1,620 | 7,669 |
| 8/31/52 | 5,514 | 535 | 1,861 | 7,375 |
| 8/31/53 | 5,163 | 351 | 2,227 | 7,390 |
| 3/31/54 | 4,885 | 278 | 2,289 | 7,174 |
| 12/31/54 | 4,615 | 270 | 2,381 | 6,996 |

\* \* \* \* \* \* \* \* \*

"On September 15, 1950, petitioner and Gilbert purchased the partnership interests of Gorham and Heppner, incurring additional acquisition costs of $5,997.58. The contract medical practice continued from that date and throughout the years involved under the name of the Boe-Gilbert Medical Group. Both this and the prior partnership continued the business begun by Callison using the same offices and records. Neither partnership capitalized the cost of acquiring any medical contracts after August 1, 1947.

"The Boe-Gilbert partnership deducted on its partnership returns the allocated cost of medical contracts terminated, each contract having an assigned cost of $30.94, as follows:

| Taxable Period | Number of Contracts Terminated | Amount |
|---|---|---|
| 9/16/50 to 8/31/51 | 642 | $19,863.48* |
| 9/ 1/51 to 8/31/52 | 535 | 16,552.90 |
| 9/ 1/52 to 8/31/53 | 351 | 10,859.84 |
| 9/ 1/53 to 3/31/54 | 278 | 8,601.32 |
| 4/ 1/54 to 12/31/54 | 270 | 8,353.80 |

*Not here in issue.

"The Boe-Gilbert partnership deducted the above sums as 'Membership write-off,' an expense item.

"During the negotiations between Gorham and Callison, no allocation of the price among the various items purchased was attempted. The covenant by Callison not to compete was similarly not allocated a share of the purchase price. The amount of $270,042.81 included good will, accounts receivable, membership con-

tracts, medical and surgical supplies and the covenant not to compete, and was a lump-sum payment for the organization and business conducted by Callison."

In his notices of deficiencies, the Commissioner "held that the balance of acquisition costs [other than fixed assets and inventory] * * * represents good will.

"Income has therefore been increased * * * representing the disallowance of membership write-off as a capital expenditure and not an allowable deduction".

Before the Tax Court, taxpayer contended that this determination was erroneous, that but 5% of the price was paid for good will, and that, subject to this adjustment, the tax returns were correct. The Commissioner's counsel stated the issue as follows:

"The remaining issue that will be litigated here today is whether the excess of purchase price of the contract medical practice over and above the agreed price of the tangible assets received along with that practice constitutes a payment for good will or whether it constitutes the payment for some 9,000 individual contracts, and *if the latter, in whole or in part, whether any losses incurred on cancellation of the individual contracts would be deductible.*

"Now, that issue remains to be litigated". (Emphasis added)

No objection was made to this statement. However, in his reply brief in the Tax Court, taxpayer's counsel did object that a new issue (represented by the emphasized language) was being injected into the case. Counsel did not suggest that, if that court accepted the new issue, the matter should be reopened for the presentation of additional evidence; he did not suggest that any additional evidence was available; he does not now so suggest; he does assert error in that the Tax Court based its decision upon the "new" ground urged by the Commissioner.

The finding that the price included good will, accounts receivable, membership contracts, medical and surgical supplies, and the covenant not to compete, and was a lump sum payment for the organization and business is fully supported by the testimony of Callison and of the taxpayer; any other would be unsupported. There was no valuation of any particular contract, no assignment of any part of the price to any contract or group of contracts. There was simply bargaining between the parties as to what would be paid for the business as a whole.

■■ Under these circumstances, we find no prejudice to taxpayer in the Commissioner's change of theory, if change there was. If the result were based upon a failure of proof by the taxpayer, and if that failure was caused by the failure of the Commissioner to stick to the theory announced by him in his notice of deficiency, we would agree with the taxpayer's complaints. (See Harbor Plywood Corp. v. Commissioner, 9 Cir., 1944, 143 F.2d 780) But here the question is not, what are the facts, but what are the legal consequences of those facts. Under such circumstances, if the result is correct, the Tax Court should sustain the Commissioner's assessment even though his legal reasoning were wrong, and we should affirm the Tax Court even though its legal reasoning were wrong. (Helvering v. Gowran, 1937, 302 U.S. 238, 245–246, 58 S.Ct. 154, 82 L.Ed. 224).

On the merits, the decision of the Tax Court is correct, and it is immaterial whether the purchase be called a purchase of one intangible asset or a purchase of "good will". Taxpayer asserts that a medical doctor has no "good will" to sell because his business is so dependent upon his personal skill that good will cannot attach. (See 38 C.J.S. Good Will § 3, p. 952 and cases there cited) This may be so, as a theoretical proposition, and the notion is reinforced by the ethics of the medical profession. But here the situation is not that of the usual medical practice. Here the contracts, though terminable at will, gave sufficient assurance of continued patronage to taxpayer

and his associates that they were willing to pay a large sum for Dr. Callison's practice. We have defined good will as "the sum total of those imponderable qualities which attract the custom of a business,—what brings patronage to the business" (Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, 175–176). We there pointed out that good will may attach to the number and quality of the customers of the business. To us, the essence of good will is the expectancy of continued patronage, for whatever reason.

Here, the buyers were the "& Staff" of "F. W. Callison, M.D., & Staff", the party with whom the patients made their contracts. The contract of sale recites that "Goodwill is an important and the principal part of the assets being sold". It allocates the purchase price (a) to physical assets (valued at $2,346.27) and (b) "The balance thereof to the Goodwill and other properties hereby transferred of said practice". There were no "other properties" of any substantial value except the contracts, and they are, in our view, inseparable from the good will. They are terminable at will, and their value depends entirely upon the expectation that they will not be terminated— that is, the expectancy of continued patronage.[1] We doubt if any value could properly be assigned to them, apart from good will. It is conceded that good will is not a depreciable asset. (See Regs. 118, § 39.23(1)–3, 1939 Code; Income Tax Regs., § 1.167(a)–3, 1954 Code).

■ Moreover, and assuming that a part of the price can be assigned to the contract separate from the price of good will, they were still purchased as a single indivisible asset, as the Tax Court correctly found, and therefore, they cannot

be amortized under Section 23(*l*), 26 U.S.C.A. § 23(*l*), or individually subject to loss deductions under Section 23(e), Internal Revenue Code of 1939, 26 U.S. C.A. § 23(e). (§ 167(a) and § 165, 1954 Code, 26 U.S.C.A. §§ 167(a), 165).

As to loss deductions, the proper rule is well stated by Judge Goodman in Metropolitan Laundry Co. v. United States, N.D., Cal., 1951, 100 F.Supp. 803, 805.

> "The gradual replacement of old patrons with new ones is not to be regarded as the exchange of old capital assets for new and different ones, but rather as the process of keeping a continually existing capital asset intact."

This is precisely what occurred here.

As to depreciation, there is no showing, nor could there be, that the capital asset involved—the contract medical business—diminished in value each time there was termination of a particular contract, nor, even if such diminution be assumed, that the amount of such diminution has any relationship to the arbitrary "cost" allotted to each contract by the taxpayer. The arbitrariness of this "cost" figure is demonstrated by taxpayer's own testimony, quoted in Footnote 1, supra.

The case is controlled by decisions such as ThriftiCheck Service Corp. v. Commissioner, 2 Cir., 1961, 287 F.2d 1; United States Industrial Alcohol Co. v. Helvering, 2 Cir., 1943, 137 F.2d 511; Meredith Publishing Co. v. Commissioner, 8 Cir., 1933, 64 F.2d 890; Houston Natural Gas Corp. v. Commissioner, 4 Cir., 1937, 90 F.2d 814. Since the cost of any particular contract cannot be determined, it is no help to taxpayer that he demonstrated that a given number of contracts actually terminated in a partic-

---

1. Dr. Boe testified:

"Having been associated with it for quite a few years before that, I knew that these contracts last variable periods. Some people drop out because they were unhappy, some of them drop out because they have died, some of them drop out because they have coverage under some arrangement. Maybe they have coverage under their husband's work, something like that, so that there are variable periods. Some members would last for a year or two. There are still members in there that joined the organization in 1920".

As shown by the table quoted in the opinion, there were terminations and new contracts written every year.

ular year. The consequence of such a termination was left open in Thrifti-Check, supra, but there a definite cost could be assigned to each contract purchased. Not so here.

Affirmed.