**WESTERN MORTGAGE CORPORA- TION, a California corporation,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. A. No. 67-1369-HP.**

United States District Court
C. D. California.

Oct. 30, 1969.

**334**

Adams, Duque & Hazeltine, by James S. Cline, Los Angeles, Cal., for plaintiff.

William Matthew Byrne, Jr., U. S. Atty., by Mason Lewis, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

PREGERSON, District Judge.

This is an action by plaintiff, Western Mortgage Corporation, against the defendant, United States of America, for the recovery of federal income taxes assessed against and collected from plaintiff for 1960, 1961, and 1962.

Federal jurisdiction and venue are invoked by virtue of 26 U.S.C. § 7422 and 28 U.S.C. §§ 1346(a) (1) and 1402(a) (2).

Plaintiff is a California corporation with its principal place of business in Los Angeles. At the time of the sale of the assets involved in this action, plaintiff was known as Rampart Mortgage Company. After the sale, plaintiff changed its name to Western Mortgage Corporation.

On June 30, 1959 plaintiff, as buyer, entered into an "Agreement of Purchase and Sale" with Western Mortgage Corporation (Old Western), as seller. Under that agreement plaintiff purchased all of the "assets, properties, rights and interests" and assumed certain liabilities of Old Western. The sale was closed on July 14, 1959 and thereafter Old Western was liquidated. One of the assets purchased by plaintiff from Old Western was a written agreement dated June 11, 1945 under which Old Western acted in a dual capacity as Metropolitan Life Insurance Company's mortgage loan correspondent and as its loan servicing agent in various counties of California.

As Metropolitan's mortgage loan correspondent Old Western placed with and sold real estate loans to Metropolitan. As Metropolitan's loan servicing agent Old Western collected principal and interest, maintained deposit accounts, and confirmed insurance coverage and real property tax payments in connection with Metropolitan's loans. Generally, a loan correspondent who places a loan with an investor such as Metropolitan will service that loan.

On September 21, 1959 Metropolitan consented to the assignment of the June 11, 1945 agreement (1945 Metropolitan contract), and recognized plaintiff as its mortgage loan correspondent and loan servicing agent under that agreement.

On the closing date, July 14, 1959, Old Western was servicing about 58,000 real estate loans for Metropolitan. The principal amounts of such loans totalled approximately 575 million dollars. Each loan was secured by a first deed of trust and was evidenced by a promissory note which had a fixed future maturity date and called for specified monthly installment payments of principal and interest. The original amount of each loan, when made, either was equal to or less than 70% of the appraised value of the real property which secured the loan or was insured by an agency of the federal government. In the pretrial order the parties stipulated that on the closing date the 58,000 loans had an average life expectancy of 7 years.

On May 6, 1959, two months before the sale with Old Western was closed, Metropolitan informed all its loan correspondents that the allotment of funds for new residential loans would be reduced in 1960, that the acquisition fees on new conventional loans would be reduced from 1¼% to ¾%, and that the service fees to be paid on new loans would be reduced for the first 10 years from ½% to ⅜% on FHA insured loans and from ½% to ¼% on conventional loans. All reductions of fees were prospective

and did not apply to the right to service the 58,000 loans in Old Western's portfolio on July 14, 1959. On all loans in Old Western's portfolio as of July 14, 1959, Metropolitan agreed to pay a service fee of ½ of 1% per annum of the outstanding loan balances. Old Western's allotment of funds for new residential loans for 1960 was reduced by Metropolitan to 15 million dollars, which was less than ⅓ of the amount allotted in 1959. However, this dollar limitation only applied to loans on one to four-family residential properties. Until 1959 Old Western's organization was geared to producing residential loans. The purpose of reducing the 1960 residential loan allotment was to induce the organization to generate loans on income producing properties of over four units, a more profitable area for loans. Due to inertia, Old Western had resisted moving into that area. The area of income property loans offered plaintiff an opportunity for substantial future profit. Income property loans, being larger than residential loans, generate greater service fees without commensurate increase in service costs.

No allocation of the purchase price, which was in excess of 4 million dollars, was made in the agreement between Old Western and plaintiff. The price paid by plaintiff for the assets of Old Western was allocated by plaintiff in its financial records for accounting and tax purposes as follows:

| | | |
|---|---:|---:|
| Fixed Assets | | |
| Building | $1,000,000.00 | |
| Land | 675,000.00 | |
| Office machinery | 137,502.00 | |
| Office furniture | 123,588.00 | |
| Total Fixed Assets | | $1,936,090.00 |
| Cash & Cash Items—Net | | 369,890.00 |
| Prepaid Items | | 5,770.00 |
| Cost of Mortgage Portfolio | | 1,922,035.00 |

*The sole dispute in this case arises out of the tax treatment to be given to the sum of $1,922,035.00 which plaintiff accounted for under the heading, "Cost of Mortgage Portfolio".* This account was treated by plaintiff as a depreciable intangible asset representing its right to service the 58,000 real estate loans. Plaintiff amortized the approximately 1.9 million dollars over 5½ years in the following taxable periods and amounts:

| | | |
|---|---|---:|
| 6/26/59 | – 4/30/60 | $ 299,010.00 |
| 5/1/60 | – 4/30/61 | 389,719.00 |
| 5/1/61 | – 4/30/62 | 384,407.00 |
| 5/1/62 | – 12/31/62 | 256,272.00 |
| 1/1/63 | – 12/31/63 | 384,407.00 |
| 1/1/64 | – 12/31/64 | 208,220.00 |
| | Total | $1,922,035.00 |

The taxable periods presently before this Court are those ending April 30, 1960, April 30, 1961 and April 30, 1962. Plaintiff timely filed its federal income tax returns for those periods and timely paid the amount of tax shown to be due on such returns.

Upon auditing plaintiff's tax returns for the years in question, the District Director seemingly took the position that the item "Cost of Mortgage Portfolio" is a nondepreciable intangible asset, disallowed the amortization deductions of $299,010.00, $389,719.00 and $384,407.00 taken in the returns and determined deficiencies in the amount of income taxes due from plaintiff as follows:

| Year Ended | | Amount |
|---|---|---:|
| 4/30/60 | | $156,514.11 |
| 4/30/61 | | 202,922.90 |
| 4/30/62 | | 201,779.06 |
| | Total | $561,216.07 |

Additional taxes in the amount of $561,216.07 were paid by plaintiff to the District Director on October 11, 1963. Assessed interest on this sum in the amount of $72,640.18 was paid on November 7, 1963.

On or about July 21, 1964, plaintiff filed its claim for refund of the internal revenue taxes attributable to the disallowance of the amortization of the "Cost of Mortgage Portfolio" for the fiscal years in question. On October 26, 1967, defendant issued notices of disallowance of such claims pursuant to Section 6532 (a) (1), Internal Revenue Code of 1954, 26 U.S.C.A. § 6532(a) (1).

In support of its position plaintiff maintains that it acquired two separate and distinct assets under the 1945 Metropolitan contract: (1) the right to service the 58,000 loans and to receive a fee of ½ of 1% per annum of the principal balance of those loans, and (2) the opportunity to place future loans with Metropolitan and to service those loans for a fee. Plaintiff contends that the right to service the 58,000 loans is a depreciable intangible asset because that right has a determinable value and a limited useful life which can be ascertained with reasonable accuracy. Further, plaintiff contends that the opportunity to place future loans with Metropolitan and to service those loans was speculative, uncertain, and of no significant value.

The Government contends that plaintiff's right to service loans under the 1945 Metropolitan contract covers both the 58,000 loans existing as of July 14, 1959 and all future loans placed by plaintiff with Metropolitan. The Government argues that this right to service both existing and future loans is a single indivisible asset because it is tied in with an ongoing business relationship between plaintiff and Metropolitan under which —through a continuing process—old loans are paid off and retired and new loans are placed with Metropolitan and added to the portfolio of loans being serviced. Further, the Government asserts that the duration of the ongoing business relationship between plaintiff and Metropolitan is indeterminate and uncertain; hence the duration of the right to service loans, which is tied in with that ongoing business relationship, is also indeterminate and uncertain and, therefore, not subject to a depreciation allowance.

In short the Government relies on the so-called "indivisible asset" rule to support its position that the right to service Metropolitan's loans is a nondepreciable asset. Later in this opinion this Court concludes that the "indivisible asset" rule is not applicable to this case.

The questions this Court must decide are the following:

One. What intangible asset or assets did plaintiff acquire under the 1945 Metropolitan contract?

Two. Apart from the 1945 Metropolitan contract, did plaintiff acquire any additional intangible asset or assets from Old Western?

Three. Which, if any, intangible asset or assets so acquired were depreciable under Section 167(a), Internal Revenue Code of 1954, 26 U.S.C.A. § 167(a), and Treasury Regulations, Section 1.167(a)– 3?[1]

---

1. Section 167 of the Internal Revenue Code of 1954, 26 U.S.C. § 167 (1954):

"167. *Depreciation*

"(a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

Treasury Regulations, § 1.167(a)–3 (1954):

"Sec. 1.167(a)–3 Intangibles.

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy,

Four. If more than one intangible asset was acquired, how is the sum of approximately 1.9 million dollars to be allocated for tax purposes?

At the outset, this Court must determine what the plaintiff bought when it acquired Old Western's rights under the 1945 Metropolitan contract. To make that determination, this Court believes it proper to take an approach which gives effect to the economic realities in existence at the time of purchase.

Plaintiff's president and majority shareholder, Mr. Hoffman, an experienced businessman, knew that under the 1945 Metropolitan contract plaintiff was acquiring two separate assets. First of all, he knew that plaintiff was buying the right to service an existing mortgage loan portfolio consisting of about 58,000 secured real estate loans with a total principal balance of approximately 575 million dollars. In 1959 the right to service a mortgage loan portfolio had a market value of 1% of the total amount of the principal balance of outstanding loans. Mr. Hoffman knew that the right to service the portfolio involved in this case had a value of about 5¾ million dollars. He also knew that the servicing fee was *fixed* at ½ of 1% per annum of the total amount of the principal balance of the loans being serviced as of July 14, 1959. By its terms the 1945 Metropolitan contract could be terminated at any time by either party by the mailing of a written notice of termination. However, plaintiff knew that if the contract were terminated, Metropolitan would exercise its right under the contract to require plaintiff to service out the existing loans, because Metropolitan lacked a servicing organization and plaintiff had a large organization of trained personnel and equipment required to handle that formidable job. Also, prior to plaintiff's purchase of the assets of Old Western,

Metropolitan orally assured Mr. Hoffman that Metropolitan felt that it had "a legal and moral obligation" in case of cancellation to allow plaintiff to service out the existing loans and to continue to pay for such servicing on the ½ of 1% basis. So, for all practical purposes, the right to service the existing 58,000 loans was fixed, definite, and certain.

Further, under the 1945 Metropolitan contract Mr. Hoffman knew that plaintiff was acquiring an opportunity to do business and to make money in the future through a continuing relationship with Metropolitan as its loan correspondent. This relationship carried with it the right to submit new loans and to service those new loans when approved by Metropolitan. Before entering into the agreement with Old Western, plaintiff had reasonable assurances from Metropolitan that the correspondent relationship as to future loans would continue so long as plaintiff's performance was satisfactory to Metropolitan. Thus, the duration of that relationship was indefinite and uncertain. Mr. Hoffman testified that assuming Metropolitan had terminated the future correspondent relationship, that nevertheless plaintiff would have closed the sale with Old Western and sought loan business from other investors. This is understandable because the right to service the 58,000 loans was an asset worth 5¾ million dollars, which asset plaintiff acquired for about a third of its value. This separate, distinct, and fixed right was by far the most valuable and attractive asset purchased.

In addition to the intangible assets acquired under the 1945 Metropolitan contract, plaintiff acquired Old Western's existing going business organization which was expected to serve plaintiff for an indeterminate time in the future. Mr. Hoffman testified that it would have cost

---

such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *"

about $250,000.00 to start up and put into operation a business organization comparable to Old Western's.

In answer to questions one and two, this Court finds that plaintiff acquired three separate intangible assets, to wit: (1) under the 1945 Metropolitan contract, the right to service the existing mortgage loan portfolio consisting of about 58,000 loans (right to service the 58,000 loans); (2) under the 1945 Metropolitan contract, the opportunity to do future business through a continuing relationship with Metropolitan as its loan correspondent (future loan correspondent relationship); and (3) the existing going business organization of Old Western (Old Western's business organization).

To answer question three, the Court must now determine which, if any, intangible asset so acquired had ascertainable useful lives and determinable values.

■ The Court finds that the right to service the 58,000 loans is an intangible asset subject to a depreciation allowance under Section 167(a) of the Internal Revenue Code of 1954 and Treasury Regulations, Section 1.167(a)–3. Each of the 58,000 loans was secured by a first deed of trust and was evidenced by a promissory note which had a fixed maturity date and called for payment of specified monthly installments. The right to service those loans for a fee was fixed and definite and was "property used in the trade or business" of the taxpayer. This right was an intangible asset known from experience to be of use in the taxpayer's business for only a limited period (each loan had a fixed maturity date), the length of which could be estimated with reasonable accuracy; therefore that intangible right was the subject of a depreciation allowance. The parties have stipulated that at the time of purchase on July 14, 1959, the 58,000 loans had an average life span of 7 years. The Court accepts that as a reasonable estimate.

■ The Court finds that the future loan correspondent relationship and Old Western's business organization are not depreciable under Section 167(a) of the Internal Revenue Code of 1954 and Treasury Regulations, Section 1.167(a)–3, since their respective useful lives are indeterminable, uncertain and cannot be estimated with reasonable accuracy.

■ Having determined that the right to service the 58,000 loans is a depreciable asset and that the future loan correspondent relationship and Old Western's business organization are nondepreciable assets, the Court must now allocate the approximately 1.9 million dollars between the depreciable and nondepreciable intangible assets. To make that allocation the Court must first place a reasonable value on each of the three assets and, then, proportionately allocate the approximately 1.9 million dollars between the depreciable and nondepreciable assets based on their relative values.

As stated above, the right to service the 58,000 loans had a market value of about 5¾ million dollars.

Although the future loan correspondent relationship had value, neither side introduced direct evidence for the purpose of fixing such value. In assigning a value to that asset the Court bears in mind the following facts: During the four years preceding the sale, Old Western had earned from correspondent activities, alone, annual average net income of $111,132.00; during that four year period its correspondent activities had accounted for 5% and its servicing activities for 95% of its net income; two months before the sale, new loan servicing fees and loan acquisition fees had been substantially reduced; the allotment of funds for 1960 residential loans had been decreased by Metropolitan in an effort to induce Old Western to generate income property loans; and the duration of plaintiff's future correspondent relationship with Metropolitan was indefinite and uncertain. Taking all these factors into consideration, the Court is of the opinion that the future loan correspondent relationship with Metropolitan had a reasonable value of about $300,-000.00. This figure, which is "roughly

hewn," [2] is about equal to three years' net income from past correspondent activities. Also, this figure of $300,000.00 bears approximately the same relationship to the value of the right to service the 58,000 loans ($5,750,000.00) as the percentage of net income from correspondent activities (5%) during the four years preceding the sale, bears to the percentage of net income from servicing activities (95%) over the like period.

Finally, based on Mr. Hoffman's testimony that it would have taken about $250,000.00 to set up an organization such as Old Western had in July of 1959, the Court finds that Old Western's business organization was reasonably worth $250,000.00.

Based on the foregoing, the two nondepreciable intangible assets together had a reasonable value of $550,000.00 as compared to $5,750,000.00, the value of the depreciable intangible asset. In answer to question four, the Court concludes that the sum of approximately 1.9 million dollars allocated by plaintiff entirely to the "Cost of Mortgage Portfolio," should properly be allocated on the following basis: [3] 91% to the right to service the 58,000 loans, a depreciable intangible asset, amortizable over seven years, and 9% to the future loan correspondent relationship and Old Western's business organization, nondepreciable intangible assets. [4]

## "INDIVISIBLE ASSET" RULE INAPPLICABLE TO THIS CASE

The "indivisible asset" rule is limited to the type of asset represented by customer lists and contracts similar to customer lists. Moreover, the rule does not apply where such asset has an ascertainable useful life and a determinable value which may be based either (a) on a "determinable amount of income"

2. Judge Friendly in C. I. R. v. Ferrer, 304 F.2d 125, 135 (C.A. 2, 1962) stated:

"In such instances, where part of a transaction calls for one tax treatment and another for a different kind, allocation is demanded, * * *. If it be said that to remand for this purpose is asking the Tax Court to separate the inseparable, we answer that no one expects scientific exactness; that however roughly hewn the decision may be, the result is certain to be fairer than either extreme."

3. The percentage allocable to the depreciable intangible asset is determined by dividing the total value of depreciable and nondepreciable intangible assets into the value of the depreciable asset; the percentage allocable to nondepreciable intangible assets is determined through a similar process.

4. In Bankers Guarantee Title & Trust Co. v. United States of America, 290 F.Supp. 522 (N.D.Ohio 1968) taxpayer, a mortgage banker, sold a mortgage servicing portfolio consisting of Metropolitan Life Insurance Company loans, and treated the entire proceeds of sale as a capital gain. The Government took the position that the seller was converting future income into present income and that the proceeds of sale were to be treated as ordinary income. The Court concluded that an allocation was required because a portion of the sale represented conversion of future income into present income and was subject to the ordinary income tax rates while the remainder represented the sale of a capital asset or goodwill. In making its allocation the Court recognized that it was lacking in scientific exactness, that it was using estimates rather than factual data, and that its allocation was "roughly hewn."

An allocation was made in Johnson v. United States, 61–1 USTC 9278 (W.D. Tex.1961). In *Johnson*, a gynecologist was permitted to depreciate the cost of patient's charts (purchased from a retiring doctor) since they were used in his medical practice and were found to have a limited useful life of 6 years on account of the transient nature of the population in that area, the limited period of time during which women have children, and the fact that women change doctors from time to time. The Court held that some *nondepreciable goodwill attached to* the charts and allocated 10% of the cost of the charts to goodwill with the remaining 90% of said cost subject to the depreciation allowance.

In Manhattan Company v. Commissioner of Internal Revenue, 50 T.C. 78 (1963) the Court allocated 75% of the cost of acquiring a customer list to a depreciable asset and the balance of 25% to goodwill.

or (b) on an individual appraisal of the lists or contracts in question. Seaboard Finance Company v. Commissioner, T.C. Memo 1964–253, Aff'd 367 F.2d 646 (C. A.9th, 1966).

In *Seaboard*, taxpayer purchased 55 small loan businesses. As part of the purchase price, taxpayer paid a premium consisting of an amount paid in excess of the face value of loans outstanding and fixed assets. This excess amount, or premium was treated by Seaboard as part of the cost of acquiring the loan contracts. Accordingly, Seaboard sought to depreciate the premium over the average useful lives of the loans, namely, 3 years for secured loans and 5 years for unsecured loans. Before the Tax Court, the Commissioner contended that the entire amount of the premium was attributable to goodwill or other unamortizable elements of value such as good prospects for loan renewals, going concern value, and a customer structure which could be solicited for allied services such as credit life insurance. The Tax Court found that the loan contracts had an ascertainable useful life and a determinable value based on a "determinable amount of income." As in this case, neither party offered evidence in support of specific allocation. Nonetheless, the Tax Court exercising its judgment found that 30% of the premium was attributable to goodwill and other nondepreciable elements of value and that the remaining 70% of the premium was attributable to the loan contracts and therefore depreciable over their average useful lives.

In Boe v. Commissioner of Internal Revenue, 307 F.2d 339 (9th Cir. 1962), a case relied on by the Government, the indivisible asset rule was applied to medical service contracts. In *Boe* the contract recited that "Goodwill is an important and the principal part of the assets being sold." The Court determined that the value of the medical service contracts, which were terminable at will, depended entirely on the expectancy of continued patronage. The expectancy of continued patronage, which, the Court stated, is "the essence of good will," does not have

an ascertainable useful life and is therefore not depreciable.

In Thrifticheck Service Corporation v. Commissioner of Internal Revenue, 287 F.2d 1 (2nd Cir. 1961), a case also relied on by the Government, the "indivisible asset" rule was applied to customer contracts because " * * * the combination of provisions for premature cancellation and automatic renewals with the history and prospect of relations continuing beyond the 10 years of the initial and first renewal terms, which is here presented, preclude any reasonable determination of a period for amortizing the amounts paid."

Similarly in United States Industrial Alcohol Co. v. Helvering, 137 F.2d 511 (2nd Cir. 1943), contracts regarded merely as a method of booking orders for future deliveries and not binding were held nondepreciable since the primary purpose for their acquisition was not to make a profit on sales related to the contracts but to keep the business alive for future sales by continuing to maintain its market. Thus, neither *Boe* nor *Thrifticheck* nor *Industrial Alcohol* involved an asset with a determinable value and an ascertainable useful life.

▌In the case before this Court, unlike *Boe*, there was no expectancy of continued patronage or repeat business ("the essence of good will") from homeowners whose loans plaintiff was servicing. Unlike *Thrifticheck*, where due to provisions for premature cancellation and automatic renewal the contracts had no ascertainable useful life, each of the 58,-000 real estate loans in this case had a fixed maturity date and experience indicated that the relations between plaintiff and borrowers would not extend beyond the lives of the loans. Neither was the primary purpose of acquiring the right to service the 58,000 loans one of maintaining a continuous market to keep th business alive, as was the case in *Industrial Alcohol*. Rather, the purpose was to receive a determinable amount of income over a "limited period, the length of which can be estimated with reasonable accuracy." Treasury Regulations,

Section 1.167(a)–3 (1954). The parties stipulated that the 58,000 loans had an average life of 7 years. This average life complies with Treasury Regulations, Section 1.167(a)–3. Accord, Seaboard Finance Co., *supra*, 367 F.2d at 653. Accordingly, plaintiff is entitled to amortize over a 7-year period that portion of the purchase price properly allocable to the right to service the 58,000 loans.

The Government attempts to distinguish *Seaboard* on the basis that the taxpayer, in that case, made an individual appraisal of the loan contracts prior to purchase. In *Seaboard,* each loan was rated following a consideration of the borrower, his employment, his job, his payment record, the effective yield on the loan, and any other relevant information. On some loans the principal balance was discounted, on others a premium was added to the principal balance, and on the remainder it was determined that the value of the loan was equal to its principal balance. The sum of the values placed by Seaboard on the loan contracts was in excess of the sum of their principal balances.

In *Seaboard,* then, the taxpayer provided an alternative basis, as well, for fixing value by individually appraising each loan contract. In that case the value of the purchased loans depended upon the effective yield of each loan, the value of collateral when present, and the ability of each borrower to pay both interest and principal when due. Therefore as a purchaser of small loan contracts, it was important for Seaboard to perform a painstaking appraisal of each loan and each borrower in order to determine the value of what it was purchasing.

In our case plaintiff was not purchasing loans, but was acquiring the right to service mortgage loans. Its fee for servicing the 58,000 loans was fixed, and the undisputed evidence indicates that the market value of the right acquired was $5,750,000.00. As far as it was concerned, plaintiff faced no question as to the value of the loans it was to service, for each loan was either insured by an agency of the federal government or ade-

quately secured by real property. Thus, unlike *Seaboard,* the value of what plaintiff purchased was determinable without individual loan analysis. Accordingly, it is not necessary, nor would it be helpful, to require plaintiff to show that it performed an analysis similar to that which took place in *Seaboard.*

Judgment shall be for plaintiff. The foregoing shall constitute findings of fact and conclusions of law under F.R. Civ.P. 52(a). Plaintiff's counsel shall prepare, serve and lodge a judgment in accordance herewith.