FIRST NATIONAL BANK OF OMAHA, a National Banking Corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
First Nat'l Bank v. Commissioner
Docket No. 1430-72.
United States Tax Court
T.C. Memo 1975-67; 1975 Tax Ct. Memo LEXIS 306; 34 T.C.M. (CCH) 360; T.C.M. (RIA) 750067; March 19, 1975
Laurens Williams,James F. Jorden, and Keith Miller, for the petitioner. Ronald M. Frykberg, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent has determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1965
$59,905.34
1966
52,169.72
1967
57,452.40
1968
41,778.24 The issues for decision are: (1) Whether the amount of $471,072 that petitioner paid to National Company pursuant to a contract for the sale of National Company's assets was for rights to service existing mortgage loans, for goodwill and similar intangible assets or for a combination of these items, (2) whether *307 the amount of $23,235.47* that petitioner paid pursuant to a transaction with the Maenner Company was for rights to service existing mortgage loans, for goodwill and similar intangible assets or for a combination of these items, and (3) whether petitioner is entitled to an amortization deduction in the amount of $338.24 claimed for 1968. FINDINGS OF FACT First National Bank of Omaha (hereinafter referred to as petitioner), is a corporation organized and existing under the national banking laws of the United States of America, with its principal office at First National Center, Omaha, Nebraska. For Federal income tax purposes, petitioner uses the cash receipts and disbursements method of accounting. Petitioner's Federal income tax returns for the years 1965, 1966, and 1967 were filed with the district director of internal revenue at Omaha, Nebraska. Petitioner's return for 1968 was filed with the internal revenue service center at Kansas City, Missouri. During the years just preceding 1965, petitioner owned between seven and ten million dollars in real *308 estate mortgages as security for loans made by petitioner. The collection of mortgage payments, the supervision of the payment of property taxes and insurance, and the various other mortgage servicing activities in connection with the loans were performed by petitioner through its mortgage loan department for its own account. Petitioner also serviced approximately $600,000 of mortgage loans held by petitioner's trust department and some small amounts for two correspondent banks. The mortgage loan department normally had between seven to nine employees. Prior to 1965 petitioner was not engaged in the business of servicing mortgage loans for institutional investors such as insurance companies or savings banks and was not earning loan servicing income. During 1964 petitioner had almost ten million dollars of real estate mortgage loans outstanding and was near the dollar ceiling for long-term investments consistent with a prudent ratio of mortgage loans to savings deposits. About July 1964 officials of petitioner began considering steps that might be taken to expand the mortgage loan department, develop relationships with institutional investors for the sale of future mortgage loans *309 and engage in mortgage servicing business. It was also recognized that present personnel was not adequate to handle any increased business and that additional space would be needed for the department. Various possibilities were explored and contacts were made in the latter months of 1964 in an effort to establish investor relationships and to find qualified individuals to staff the department. About December 1964 officials of petitioner learned that the National Company of Omaha (hereinafter referred to as National) might be for sale. National had been engaged in the mortgage banking business in Omaha, Nebraska, for about 35 years. It was one of the largest mortgage loan servicing companies in the Omaha area. National was then actively selling mortgage loans to a number of institutional investors and had servicing arrangements with more than 20 institutional investors for which it was servicing residential mortgage loans with total principal balances of about 52 million dollars. National also operated an insurance department. National's offices were located on the eighth floor of the same building in which petitioner's business was conducted. Pursuant to its mortgage servicing *310 agreements, National undertook to perform certain services including the collection of principal and interest payments due on the mortgages, payment of taxes, assessments and other charges, maintaining books and records of all transactions relating to the mortgages and other related services. National had 1,723 shares of stock outstanding, 878 shares of which were held by petitioner's trust department as trustee under a trust established by John T. Stewart III pursuant to a trust agreement dated July 2, 1962. The remaining shares were owned as follows: Bert P. Allen, 408 shares; John T. Stewart IV, 300 shares; Irene Cole Wilson, 100 shares; Prima Company, 35 shares; and Henry Ray Millard, Jr., 2 shares. National had 22 or 23 employees in its mortgage department. The president of National was Bert P. Allen. The key employees in the mortgage loan department were Allen, Robert J. Horak, and Don C. Maurer, all three of whom were experienced in the mortgage loan and servicing business. On December 21, 1964, petitioner's executive committee, composed of John R. Lauritzen, John F. Davis, and F. P. Giltner, met to consider petitioner's possible purchase of National. The committee determined *311 that Allen should be contacted to ascertain what his attitude would be with reference to joining petitioner as an employee and directing the mortgage loan department. During January 1965, officials of petitioner gathered and reviewed information regarding National's business and financial condition. Certified audit reports of National reflected that its operating income was principally attributable to the operations of its mortgage loan department. The mortgage loan department's primary source of income was mortgage loan servicing income. Additional amounts of income were realized from commissions paid by borrowers upon the origination of loans and from income realized upon the sale of mortgages to investors. National's interest income was to a large extent offset by interest expense paid by National on its borrowings. In January 1965 National's majority stockholders, the John T. Stewart III Trust and John T. Stewart IV, authorized petitioner's trust department to undertake steps leading to the sale of their shares to the highest bidder. Petitioner's officials understood that the banking laws of Nebraska prohibited petitioner from owning an interest in or operating an insurance *312 business. Accordingly, at meetings of petitioner's executive committee on January 18 and 26 of 1965 and of petitioner's board of directors on January 26, 1965, various means were discussed whereby petitioner would acquire only certain of National's assets. The discussions at these meetings also focused upon whether Allen would be available for employment by petitioner and whether Bankers Life Insurance Company, National's largest investor owning about 15 million dollars in mortgage loans being serviced by National, would consent to an assignment of the servicing rights. The bidding procedure for sale of the National Company required that bidders submit a bid for shares of National's stock and also for the assets of National. The bids were to be received on February 5, 1965. Petitioner submitted an offer to purchase assets of $950,888 comprised of three amounts, $353,787, $471,072 and $126,029. The amount of $353,787 was for the assets shown on National's October 31, 1964, balance sheet (other than unrestricted cash, officers and employees accounts, cash value of life insurance, and insurance department assets) less liabilities to be assumed by petitioner with respect to such assets. *313 The amount of $471,072 was described in the offer as for "the rights of National to service real estate mortgage contracts." This amount was approximately 0.9 percent of the total outstanding mortgage loan balances being serviced by National. In arriving at this figure, officials of petitioner understood that the prevailing price range for mortgage servicing rights was from about 0.5 percent to 1.5 percent of the total outstanding principal balances of the mortgage loans being serviced. The amount of $126,029 was for the assets of National's insurance department, which offer was made on behalf of a third party. The $353,787 and $126,029 amounts were subject to adjustment to reflect book values as of the date of closing. Petitioner also submitted an offer to purchase outstanding capital stock of National for $500,000, subject to adjustment for changes in net worth in excess of $10,000 between the October 31, 1964, balance sheet date and the date of closing. After the bids were open and reviewed by National's representatives, it was concluded that the petitioner's offer for assets was the highest bid. Although petitioner's bid was announced as the highest bid on February 5, 1965, the *314 offer was not formally accepted on such date. On February 8, 1965, the petitioner's executive committee met and concluded that if petitioner's offer were accepted the committee would consider electing Allen as vice president and Horak and Maurer as assistant cashiers. During the period February 14 through February 18, 1965, Giltner and Allen made a trip together to call upon certain of National's larger investors located in New York City and other eastern cities for the purpose of discussing the possibility of securing their consent to the potential assignment of servicing rights by National to petitioner. On a separate trip during mid-February Giltner and Allen contacted Bankers Life in the same regard. During these trips the investors were assured that Allen, as a vice president, would head up petitioner's mortgage loan department, that the same servicing personnel that had been employed by National would be offered employment by petitioner, and that the investors could be confident of continued good service. On February 23, 1965, petitioner submitted an amended offer to purchase assets to National. Under Article 3 of the amended offer National, which represented that it was *315 servicing mortgages in the principal amount of approximately $51,500,000, was required to assign to petitioner its rights to its existing mortgage servicing contracts and to provide petitioner with copies of such contracts. National was also required to deliver to petitioner within a reasonable time after closing a written consent of each investor to such assignment, or in the alternative, the oral assurance of each investor that petitioner would be granted the right to continue servicing the existing mortgages of such investor. Under Articles 5 and 6 of the corrected bid, petitioner guaranteed that the assets of National used in connection with the operation of its insurance agency would be purchased by the undisclosed principal for the sum of $126,029 and that the undisclosed principal would assume certain liabilities of National directly related to its insurance agency operation. Under Article 8 of the amended offer, National was required to deliver to petitioner as the purchaser of its mortgage servicing rights such books, records, documents and files as were convenient or useful for continuing such business without unnecessary interruption. These documents included the mortgage *316 notes themselves, the details of the terms of the notes, the files on the individual borrowers, records of insurance and tax payments, and appraisals of the properties in question. Correspondence relating to collection efforts was also included in these records. Petitioner's amended offer was formally accepted by National on February 23, 1965. Petitioner's offer to purchase the assets of National's insurance department was made on behalf of the Harry A. Koch Company. On February 23, 1965, National had mortgage loan servicing agreements with 24 different investors and under these agreements was servicing a total of 4,710 loans, the total principal balances of which were $52,036,257.40. The bank had not previously represented or serviced mortgage loans for any of these 24 investors. The various servicing agreements generally provided for servicing fees of 3/8 percent of the outstanding principal mortgage loan balances, although a few specified fees of 1/4 percent and 1/2 percent. Most of the agreements were terminable by the investors upon 30 or 60 days' notice. The agreements were not assignable without the consent of the investors. All but one of the 22 or 23 employees in National's *317 mortgage loan department were immediately hired by petitioner. Although Allen had been receiving a salary of $25,000 per year with National, petitioner made him an offer of $18,000 per year to join their mortgage loan department. Allen accepted this position and was elected vice president of petitioner and placed in charge of the mortgage loan department. Horak and Maurer were elected assistant cashiers of the department. Petitioner continued the servicing of the mortgage loans without any interruption in business activity using the same office space, files, books, records and facilities as had been used by National. During the years 1965 through 1968, petitioner sold new mortgages with total principal balances of $45,813,831.30 to seven of the institutional investors for whom National had previously serviced mortgage loans. Prior to December 10, 1964, the T. H. Maenner Company of Omaha, Nebraska (hereinafter referred to as Maenner Co.) had been servicing mortgage loans for the John Hancock Mutual Life Insurance Company (hereinafter referred to as John Hancock). About December 10, 1964, John Hancock gave petitioner its approval to negotiate with the Maenner Co. for the purchase *318 of the John Hancock account. Maenner Co. rejected petitioner's initial offer to purchase the right to service the mortgage loans currently being serviced by Maenner Co. by letter dated March 15, 1965. Maenner Co. did, however, make a counteroffer to sell these mortgage loan rights for 15 percent less than the company's annual service income for the prior year. On March 31, 1965, petitioner agreed to purchase the existing rights of Maenner Co. to service mortgage loans for John Hancock. The purchase price was $23,235.47 ** or 8/10 of 1 percent of the aggregate principal balances of all such mortgage loans as of the date of closing, whichever was less. Upon closing Maenner Co. agreed to transfer and deliver to petitioner all information, records and documents necessary and proper for the petitioner to continue servicing such mortgage loans.
On April 7, 1965, John Hancock consented to the assignment of servicing rights by Maenner Co. to petitioner effective April 22, 1965. As of that date Maenner Co.'s right to originate new investments for John Hancock was terminated. *319 As of April 26, 1965, the principal balances of the mortages being serviced for John Hancock totaled $2,782,600.36. On April 26, 1965, petitioner and John Hancock entered into a correspondent agreement under which petitioner could for the first time act as a correspondent for the acquisition, origination and servicing of real estate mortgage investments for John Hancock. Prior to this agreement petitioner had not represented or serviced mortgages for John Hancock. Following the transaction with petitioner, the Maenner Co. went out of the mortgage servicing business. During the years 1967 and 1968, petitioner made sales of new mortgages to John Hancock with principal balances totaling $1,633,349.50 and $1,904,961.47, respectively. OPINION The first issue is whether the amount of $471,072 that petitioner paid to National pursuant to a contract for the sale of National's assets was for rights to service existing mortgage loans, for goodwill and similar non-amortizable intangible assets or for a combination of these items. The petitioner contends that the entire amount was paid exclusively for rights to service existing mortgage loans and that the entire amount therefore may be amortized *320 over a period of eight years, which period has been stipulated by the parties as the average useful life of the mortgage loans in issue. The respondent contends that a substantial amount of the consideration in issue was paid for goodwill and similar intangibles and that this portion does not qualify for amortization. [1]
The right to service an existing mortgage loan is an income-producing asset with a useful life since the income derived from performing the requisite services ceases when the mortgage loan itself is retired. Accordingly, amounts paid for the right to service a mortgage loan are amortizable pursuant to section 167(a). First Pennsylvania Banking and Trust Co.,56 T.C. 677 (1971); Western Mortgage Corporation v. United States, 308 F. Supp. 333 (C.D.Cal. 1969). If, however, the purchaser has not paid for mortgage servicing rights, *321 but rather has purchased goodwill, going concern value, business organization, investor and borrower relationships, opportunities for future business and income and similar intangibles, he is not entitled to a deduction for amortization. Income Tax Regs., section 1.167(a)-3; First Pennsylvania Banking and Trust Co.,supra.The sale of the assets of a business organization that is engaged in the business of servicing mortgage loans often consists of the sale not only of mortgage servicing rights but also of goodwill and similar intangibles that will be of value to purchaser in maintaining and expanding a mortgage servicing business. First Pennsylvania Banking and Trust Co.,supra, and cases cited, therein. We conclude that a portion of the amount in issue was paid for goodwill and similar intangibles that are not subject to amortization. During 1964, when petitioner had almost ten million dollars of real estate mortgage loans outstanding, it was near the dollar ceiling for long-term investments consistent with a prudent ratio of mortgage loans to savings deposits. The mere purchase of mortgage servicing rights would not serve to solve *322 this potential problem. On the other hand, the purchase of not only such rights but also the goodwill and business organization of a company such as National, which had established investor relationships with insurance companies and savings banks, would offer an attractive solution since petitioner would thereby acquire the opportunity to sell its mortgage loans to these investors. Although petitioner had a mortgage loan department prior to acquiring the assets of National, this department had serviced only its own mortgage loans. It had never serviced mortgages for any institutional investors, such as savings banks or insurance companies. Thus, by acquiring the business organization and investor relationships of National, petitioner gained the opportunity to establish and develop permanent investor relationships with the 24 institutions for whom National had been servicing mortgage loans. In furtherance of its desire to establish investor relationships, the petitioner initially employed all but one of the individuals who had been servicing loans with National. The record establishes that the petitioner was successful in establishing investor relationships as a result of its transaction *323 with National. During the years 1965 through 1968 the petitioner did sell mortgages, the total balance of which exceeded $45,000,000, to seven of the investors for whom National had been servicing mortgage loans. The petitioner relies on several factors in support of its position that the amount in issue was paid solely for mortgage servicing rights. Petitioner argues that it was not purchasing goodwill or business organization since it already had a mortgage loan department prior to the purchase of National's assets. As we previously have stated, this department had serviced only its own mortgage loans and had never serviced mortgages for any institutional investors. Petitioner further contends that it had no need for any of the employees of National because its own personnel were capable of performing the duties required to service mortgage loans. According to petitioner, it did not discuss with Allen, the president of National, the possibility of employing him until after petitioner's bid had been offered. The record establishes, however, that petitioner did in fact hire all but one of National's employees and its minutes reflect that discussions relating to the possible employment *324 of Allen had taken place prior to the bidding on February 5, 1965. Petitioner contends that it already had established a relationship with John Hancock whereby petitioner would originate and service new mortage loans for John Hancock. Thus, according to petitioner, it was not interested in developing investor and borrower relationships with any of the institutional investors for whom National had been servicing mortgage loans. The record fails to support petitioner's allegation that it had established an investor relationship with John Hancock prior to the bidding. To the contrary, petitioner did not enter into such an agreement with John Hancock until April 26, 1965. Furthermore, we do not understand how the establishment of an investor relationship with one institutional investor would support the allegation that petitioner had no desire to establish such relationships with other institutional investors. Petitioner also contends that it was purchasing National's name, records, customer lists and similar intangibles on behalf of an undisclosed principal. This allegation, however, fails to specify that the undisclosed principal was purchasing only the insurance business that National *325 previously had conducted and that any items relating to goodwill or going concern value that were included in this portion of the transaction related only to National's insurance business and not to its mortgage loan servicing business. Petitioner further argues that it did not acquire the right to act as a "mortgage loan correspondent" whereas that right was acquired in the previous cases in which the courts have determined that the purchase price must be allocated. This distinction is based merely on differences in terminology and fails to recognize the economic realities of the transaction. A mortgage loan correspondent agreement typically provides that the correspondent agrees to submit mortgage loans to the investor and to act as an agent for the investor in servicing these loans. The investor, however, is not obligated to purchase all mortgage loans that are submitted and may terminate the agreement as to any or all loans at any time. Thus, acquiring the right to act as a "mortgage loan correspondent" would not have provided any greater advantages to petitioner than were acquired pursuant to the present transaction. Whatever terminology is used, the transaction provided petitioner *326 with the opportunity to establish and develop relationships with institutional investors for the purpose of selling and servicing mortgage loans. Having determined that the amount of $471,072 was paid not only for mortgage servicing rights but also for goodwill and similar intangibles, we next must determine what portion of this amount was paid for goodwill and is therefore not amortizable. Neither the petitioner nor the respondent presented experts to value the right to service existing mortgage loans as was done in First Pennsylvania Banking & Trust Co.,supra. On the basis of the record it is difficult to allocate the purchase price between the purchase of mortgage servicing rights and goodwill including going concern value and similar intangibles. The petitioner argues that, in the event we should find that an allocation is required, we should allocate no more than 15 percent of the purchase price to goodwill and similar intangibles. Petitioner reasons that in First Pennsylvania Banking and Trust Co.,supra;Realty Loan Corp.,54 T.C. 1083 (1970), affirmed 478 F. 2d 1049 (C.A. 9, 1973); and Western Mortgage Corp. v. United States,supra, *327 it was determined that the amounts attributable to non-amortizable assets were 15 percent, 12 percent and 9 percent, respectively, of the total amounts in issue therein and that because the facts in the present case are more favorable to petitioner than those in the three prior cases, the allocation to nonamortizable assets in the present case must be lower than those previously determined. Many of petitioner's arguments are based on allegations that we have previously considered and rejected. We recognize that petitioner did have a mortgage loan department of its own prior to the National transaction. Although this department had not previously serviced mortgages for an institutional investor, it had a degree of expertise with regard to the daily operation of a mortgage loan servicing business. Thus, the peititioner presumably would be less desirous of purchasing the organization of a mortgage loan company as it related to such daily operations than a purchaser who had no previous experience whatsoever in the mortgage loan business as was the situation in First Pennsylvania Banking and Trust Co.,supra.Furthermore, we recognize that the petitioner in the present case was *328 not purchasing the right to use escrow deposits, whereas that right was being purchased in First Pennsylvania Banking and Trust Co.,supra.
Petitioner has failed, however, to discuss a factor that in our opinion would influence a purchaser to decrease the amount of the purchase price that he would allocate to the mortgage servicing rights. This factor is the difference in service fee rates that the purchaser would receive with respect to servicing the mortgage loans that were acquired. For instance, in First Pennsylvania Banking and Trust Co.,supra, the service fee rate for most of the loans was.00491 of the outstanding balance whereas in the present case the rate generally was only.00375. A purchaser of mortgage loan servicing rights certainly would take into account this lower service fee rate in determining the price he would pay for such rights, since a lower rate would result in reduced gross service fee revenues. Thus, if the service fee rate in First Pennsylvania Banking and Trust Co.,supra, had been.00375 rather than.00491, the percentage of the purchase price allocated to non-amortizable assets would have been greater than 15 *329 percent. Although petitioner had discussed three similar cases in which no more than 15 percent of the purchase price was allocated to goodwill and similar intangibles, petitioner has failed to point out that in the similar case of Bankers Guarantee Title & Trust Co. v. United States,290 F. Supp. 522 (N.D. Ohio 1968), affirmed per curiam 418 F. 2d 1084 (C.A. 6, 1969), the court allocated a significantly higher percentage of the purchase price to non-amortizable intangibles. In that case, in which the service fee rate apparently was higher than in the present case, the court held that 27 percent of the sales proceeds were attributable to non-amortizable intangibles. Although we recognize that the facts in the prior cases are more favorable to petitioner with respect to certain factors, we believe that on balance, the factors in the present case require that a portion of the purchase price be allocated to goodwill and similar intangibles. After a consideration of the entire record, we hold that $372,147 is allocable to the right to service existing loans and that $98,925 is allocable to goodwill and similar intangibles of indefinite duration. *330 Because the parties have failed to call expert witnesses to testify regarding the determination of a proper allocation, we have made our best judgment as to the proper allocation on the basis of a limited record. Although this determination is "roughly hewn," we believe it is fairer than making no allocation. See Commissioner v. Ferrer,304 F. 2d 125 (C.A. 2, 1962). With regard to the transaction with the Maenner Co., the issue before us is identical to the issue in the National transaction. The petitioner argues that the entire purchase price was paid solely for the right to service existing mortgages for John Hancock. The respondent contends that a substantial portion of the purchase price was attributable to goodwill and similar intangibles. Petitioner's argument is based on its allegation that it became the mortgage loan correspondent for John Hancock on December 10, 1964, and that therefore, on March 31, 1965, the date of the Maenner Co. transaction, petitioner had no need to acquire the opportunity to do new mortgage business with John Hancock. We have found that petitioner did not become a mortgage loan correspondent for John Hancock until April 26, 1965. We *331 further conclude that petitioner would not have become John Hancock's mortgage loan correspondent had it not successfully concluded the purchase from Maenner Co. of the right to service mortgages for John Hancock. Thus, the purchase gave the petitioner the opportunity to establish an investor relationship with John Hancock and to do future business with the company. The petitioner was in fact successful in establishing such a relationship and during the years 1967 and 1968 sold new mortgage loans to John Hancock in the amounts in excess of $1.6 million and $1.9 million, respectively. The transaction apparently did not give petitioner the right to use escrow deposits nor did petitioner employ any of the former employees of the Maenner Co. We conclude that a portion of the purchase price was attributable to goodwill and similar intangibles. After a consideration of the entire record, we hold that $18,356.02 is allocable to the right to service existing mortgages and that $4,879.45 is allocable to goodwill and similar intangibles of indefinite duration. The final issue is whether petitioner is entitled to an amortization deduction in the amount of $338.24. The petitioner on its return *332 for 1968 claimed an amortization deduction for that amount. The petitioner offered some testimony that the deduction was based upon a payment of $4,159.68 to Conservative Investment Company in 1968 allegedly for rights to service mortgages. The respondent's objection that the contract would be the best evidence of what was purchased was sustained by the Court. There was no evidence that the witness participated in the transaction. A second witness called by the petitioner testified that there was a written contract. The written contract, however, was never offered into evidence. We conclude that the petitioner has failed to satisfy its burden of proving that it is entitled to an amortization deduction of $338.24 for 1968. Decision will be entered under Rule 155.
Footnotes
*. By Official Tax Court Order dated April 16, 1975, and signed by Judge Wiles↩, this figure was changed to read as above.
**. By Official Tax Court Order dated April 16, 1975, and signed by Judge Wiles↩, this figure was changed to read as above.
1. The transaction that gave rise to this issue is the same transaction considered in John T. Stewart III, Trust, First National Bank of Omaha, Trustee, Transferee, et al.,↩ 63 T.C. (March 19, 1975).